**SO ORDERED.**

**SIGNED this 10th day of January, 2008.**

_____
LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE

_____

# United States Bankruptcy Court
Western District of Texas
San Antonio Division

| | |
|---|---|
| IN RE<br><br>TEXAS PIG STANDS, INC.<br><br>*DEBTOR* | BANKR. CASE NO.<br><br>05-52336-LMC<br><br>CHAPTER 11 |

### ORDER GRANTING AUTHORITY FOR LIQUIDATION TRUSTEE TO DISTRIBUTE SALE PROCEEDS

On December 17, 2007, the court heard the motion of the Liquidation Trustee appointed under the debtor's confirmed chapter 11 plan seeking to make distribution of the remaining proceeds from the sale of a restaurant post-confirmation. The restaurant property (referred to here as the "Hailey's Property") was included in the liquidation trust under the terms of the plan and the incorporated liquidation trust agreement. (Doc. #196). The Liquidation Trustee wants to use the remaining proceeds to pay former employees of the restaurant who had worked for no pay for a period following confirmation and before the sale, and to pay certain post-confirmation trade vendors who had provided goods and services to the restaurant.

The motion drew an objection from the Texas Comptroller of Public Accounts ("Comptroller"), who argued that the proceeds sought to be distributed to post-confirmation trade vendors and to former employees were in fact encumbered by statutory liens for unpaid sales taxes, and so had to be paid over to the Comptroller instead.

It is undisputed that the remaining proceeds from the sale of the Hailey's property total $62,655.35.[1] It is further undisputed that this amount is insufficient to satisfy all of the Liquidation Trustee's post-confirmation obligations.[2]

## Jurisdiction

The Comptroller argues as a preliminary matter that the court lacks subject matter jurisdiction over this matter because the liabilities of the Liquidation Trust were incurred post-confirmation and, therefore, are not liabilities of the debtor. In response, the Trustee argues that at least part of the liabilities owed to the Comptroller arose pre-confirmation, and that the Comptroller cannot assert liens post-confirmation for these pre-confirmation liabilities. Both the Comptroller and the Liquidation Trustee miss the mark, however. While a bankruptcy jurisdiction narrows somewhat after the confirmation of a plan, it does not instantaneously disappear. There is still "related to" jurisdiction encompassing those matters affecting the administration of the estate and

---

[1] This amount includes the payment of normal closing costs, first lien holder indebtedness and property taxes. It does not include the payment of balances owed to the first lien holder's attorneys and to a contractor who had released its statutory mechanic's lien to allow the closing to go forward.

[2] The first lien holder claims that, in addition to its secured claim, it is entitled to reasonable attorney fees of $24, 271.44. Also, the contractor responsible for repairing the property claims that it is owed an additional $1,547.26 that was previously secured by a statutory mechanic's lien (but the lien was released with the understanding that the balance would be paid from the proceeds). The Comptroller asserts that it is owed $242,842.64 in taxes, penalties, and interest accrued pre-petition, pre-confirmation, and post-confirmation. The Trustee lists, in its motion, several trade creditors and unsecured post-confirmation creditors which have not received payment. Finally, the Trustee lists certain employees who did not receive paychecks and calculates that these employees are owed $49,753.37 for post-confirmation work that went unpaid.

the interpretation or implementation of a confirmed plan. *See U.S. Brass Corp. v. Travelers Ins. Group (In re U.S. Brass Corp.),* 301 F.3d 296, 305 (5th Cir. 2002) (". . . . [T]he outcome could affect the parties' post-confirmation rights and responsibilities. Furthermore, this proceeding will certainly impact compliance with or completion of the reorganization plan."). The liquidating plan in this case, like the one in *U.S. Brass Corp.*, has not been *fully* consummated. There is a live dispute as to what obligations the Liquidation Trustee undertook from the debtor with respect to the Comptroller and what relief the plan afforded the Comptroller should the Liquidation Trustee fail to satisfy those obligations. The Comptroller argues that the terms of the confirmed plan (as modified by this court's confirmation order) entitle it to assert a tax lien against any and all trust assets for all of the Liquidation Trustee's tax obligations. The Liquidation Trustee argues that the Comptroller cannot assert a lien for pre-confirmation obligations on post-confirmation trust assets. The resolution of that dispute turns on the interpretation and the proper implementation of the plan, and not until that dispute is resolved can the plan be properly executed. That brings the case squarely within *U.S. Brass*. *See In re U.S. Brass Corp.,* 301 F.3d at 304-05.

**Analysis of the Merits**

The central issue that needs to be resolved is whether the Comptroller had the right to impose statutory tax liens post-confirmation for pre-confirmation unpaid sales taxes. The Comptroller's rights turn in part on the language of the plan and the order confirming that plan. The confirmation order obligated the Liquidation Trustee to pay the Comptroller's pre-petition priority claims as well as its post-petition/pre-confirmation administrative claims.

> The prepetition priority claims of the Texas Comptroller and Texas Workforce Commission will accrue interest at the rate of 8.25% from the Effective Date until paid. These claims will be paid in equal quarterly installments of principal and interest, with the first

-3-

> such quarterly installment being due 90 days after the Effective Date, and ending with a balloon payment on the Distribution Date of any unpaid balance owed on the claims. The amount of the quarterly payments will be in an amount equal to that necessary to amortize the claims over six years from the date of assessment of the claims.
>
> The administrative claim for October and November 2005 sales taxes and accrued penalty and interest thereon will be paid on the Effective Date. Any additional expense tax claims owed to the Texas Comptroller and Texas Workforce Commission will also be paid on the Effective Date.

Confirmation Order at 2-3 (Doc. #226). The plan contains default language which entitles the Comptroller to assert rights and remedies under non-bankruptcy law in the event of a default paying the Comptroller:

> A failure by the Trustee to remain current on its postconfirmation Texas sales and employment taxes *or to make a payment to the Texas Comptroller or Texas Workforce Commission pursuant to the terms of the Plan shall be an Event of Default*. If the reorganized Debtor fails to cure and Event of Default as to tax payments within ten (10) days after service of a written notice of default from the Texas Comptroller or Texas Workforce Commission, the taxing entity issuing the notice of default may (a) enforce the entire amount of all of its claims (b) *exercise any and all rights an remedies under applicable nonbankruptcy law*, and (c) seek such relief as may be appropriate in this court.

Second Amended Plan of Confirmation, art. VIII (Doc. #196) (emphasis added). Thus, under the plain language of the confirmation order, the Liquidation Trustee was obligated to satisfy all of the debtor's pre-confirmation tax liabilities owed to the Comptroller. Under the plain language of the confirmed plan, the Liquidation Trustee was also obligated to remain current on all post-confirmation sales taxes. The plan made clear that the failure to do either of these things would constitute an Event of Default, entitling the Comptroller to assert *all* of its non-bankruptcy rights and remedies.

At some point in October of 2006, the Trustee did fall behind on its post-confirmation sales

-4-

taxes, and the Comptroller sent the Trustee a notice of the default, per the terms of the plan. On November 7, 2006, more than ten days after the initial notice, the Comptroller sent the Liquidation Trustee another letter notifying the Trustee that it was exercising its rights under the confirmed plan to accelerate the entire amount of its claims, both pre- and post-petition. Then, on January 11, 2007, the Comptroller filed a tax lien notice pursuant to chapter 113 of the Texas Property Code. *See* TEX. TAX CODE §§ 113.001 et Seq. (Vernon 2007). It is the Comptroller's position that the tax lien notice filed on January 11, 2007 in the amount of $18,058.19 is sufficient to cover the entire $242,842.64 owed to the Comptroller.[3]

The Comptroller's tax lien arose under the Texas Tax Code. Section 113.006(b) of that Code provides that a single tax lien notice is "sufficient to cover all taxes of the same nature, including penalty and interest computed by reference to the amount of tax, that may have accrued before or after the filing of the notice." TEX. TAX CODE § 113.006(b). Furthermore, the tax lien attaches to all of the property of a person liable for the taxes. *Id.* § 113.001(b). The tax lien asserted here, then, appears to comply with state law. As the plan permits the Comptroller to employ its state law remedies in the event of a default, the Comptroller would appear to be correct in its assertions here.

The Liquidation Trustee argues, however, that a tax lien cannot attach to these sale proceeds

---

[3] In an additional letter, admitted as evidence at the hearing, counsel for the Comptroller represented the running calculation of the Liquidation Trustee's sales tax liability. According to that exhibit, for the tax period from January 2005 through November 2006, the Trustee owed $172,610.09 in net taxes, $39,760.00 in penalties, and $ 30,472.55 in interest. The Comptroller filed a subsequent tax lien notice on December 13, 2007 for the same amount as the first notice, but this time naming Texas Pig Stands, Inc., Liquidation Trust as the taxpayer (as opposed to simply naming Texas Pig Stands, Inc.). During the hearing, the Comptroller represented to the court that this second lien notice was not required by the Tax Code but was filed to resolve any disputes about the Trustee's tax liabilities or that the liens attached to trust property. The court inquired whether a single lien notice in such a low amount was sufficient notice to assert a lien amount exceeding $240,000.00. However, no party has challenged the Comptroller's claim as to lack of notice. Furthermore, the confirmed plan contemplated the Comptroller's assertion of non-bankruptcy rights and remedies. The filing of a single tax lien notice apparently is such a remedy contemplated by the confirmed plan. For these reasons, the court will leave for another day whether this right under state law comports with constitutional due process requirements.

— at least not for the full amount of $242,842.64 — because the sale proceeds are derived post-confirmation. He urges that pre-confirmation tax liabilities cannot be the basis for imposing a lien on a "post-confirmation asset." The Liquidation Trustee also argues that the Trust cannot be liable for pre-confirmation tax liabilities, because the Trust is not the "taxpayer" that incurred the pre-confirmation tax liabilities, further supporting his contention that the Comptroller cannot assert this lien against Trust assets.

The Trustee's position is not sustainable, however. The confirmation order makes clear that the Liquidation Trustee would be liable to the Comptroller for the estate's pre-confirmation tax liabilities.[4] Furthermore, under the terms of the plan, *either* the failure to make good on the payment of those pre-confirmation claims *or* the failure to remain current on post-confirmation tax liabilities constitutes an Event of Default. As of the Effective Date of the plan, the Trustee became the "person liable" for the debtor's pre-confirmation sales taxes and remained liable to the Comptroller for all post-confirmation sales taxes. This conclusion is further bolstered by the fact that the Liquidation Trustee continued to operate post-confirmation under the debtor's pre-existing sales tax permit, failing to obtain its own permit from the Texas Workforce Commission.

There can be no dispute but that an Event of Default occurred on November 7, 2006, when the Liquidation Trustee failed to remain current on its post-confirmation sales tax obligations. The Comptroller, relying upon the default language in Article VIII of the plan, exercised its non-bankruptcy rights and remedies by accelerating the Trustee's pre- and post-confirmation tax liabilities and by asserting a tax lien under Texas law. The filing of a single tax lien notice was

---

[4] Recall that the confirmation order required the Trustee to make equal quarterly payments of the pre-petition tax claims with a balloon payment on the Distribution Date (nine months after the September 13, 2006 Confirmation Date). The confirmation order also required full payment of all of the Comptroller's administrative tax claims within 30 days of the Confirmation Date.

legally sufficient to cover all taxes of the same nature, including penalties and interest accrued on the same tax obligation. *See id.* § 113.006(b). The total liability to the Comptroller of $242,842.64 is attributable to the Trustee's delinquent sales tax liabilities (both pre- and post-confirmation), penalties, and interest. Thus, the total liability is covered by the single tax lien notice filed by the Comptroller. *See id.* The tax lien is clearly valid under the Texas Tax Code and attached to the proceeds from the sale of the Hailey's property. *See id.* § 113.001(b). As such, the Comptroller is entitled to distributions from the sale proceeds to the extent that the proceeds are available to satisfy the Comptroller's tax lien, subject to the payment of prior liens and claims. Unfortunately, the sale proceeds will not satisfy the Comptroller's tax lien in full. The employees, trade vendors, and all other general unsecured creditors therefore will remain unpaid.[5]

The Comptroller's tax lien is not first in priority. The first lien holder, Inter National Bank is entitled to recover its reasonable attorneys' fees (because they are part of the obligation of the debtor secured by the property), and Gerloff Company must also be paid for the repairs it performed to the Hailey's property which enabled the sale to go forward.[6] There are no other parties asserting liens or any other security interests in the sale proceeds, but there is also no dispute that the unpaid employees and trade creditors are unsecured creditors, and that the lien claims, if allowed, will

---

[5] This is, no doubt, an unfortunate result, but one which is mandated by the Texas Tax Code itself. The court can only refer these unpaid employees and trade vendors to Governor Rick Perry's office and to the office of the Texas Comptroller for a fuller explanation for why the state elected to deprive them of their honest, hard-earned compensation. The unpaid employees and trade vendors have a clear moral priority over the claims of the Comptroller for unpaid sales taxes. But for the employees' willingness to work at the restaurant and the trade vendors' willingness to extend credit to the Liquidation Trustee, there would not have been any money to pay the Comptroller. The state clearly is receiving an economic windfall, and further expects these employees to work for free to confer that windfall. Despite the employees' and vendors' moral priority, the Comptroller nonetheless holds legal priority under the Tax Code and the confirmed plan. This court is bound by the latter.

[6] The Liquidation Trustee represented that Gerloff held a statutory mechanic's lien on the Hailey's property for this balance but that Gerloff waived its mechanic's lien to allow the sale to close with the understanding that the balance of its claim would be paid from the proceeds of the sale. Because no party contests such a distribution to Gerloff, the court will allow Gerloff to receive the balance of its claim notwithstanding its lien waiver.

completely use up all proceeds available for distribution, leaving nothing for unsecured creditors.

Inter National Bank is entitled to payment of its reasonable attorneys' fees from the proceeds of the Hailey's property sale, because fees incurred by the lender in protecting and enforcing its lien claim are themselves secured by the property. The Comptroller does not contest that the fees are part of the bank's secured claim, but does challenge whether the fees sought are reasonable. As the fees were incurred post-confirmation, the standard of reasonableness is not governed by the Bankruptcy Code, but rather by state law and the terms of the notes themselves. *See Weedling v. PNC Bank (In re Weedling),* 205 Fed. Appx. 955 (3rd Cir. Nov. 6, 2006) (citing *Rake v. Wade,* 508 U.S. 464, 468, 113 S.Ct. 2187, 124 L.Ed.2d 424 (1993)).

At the hearing, Thomas Harmon, counsel for the first lien holder, represented that the bank incurred reasonable attorneys' fees of $24,271.44.[7] Harmon tendered as an exhibit a fee detail for those post-confirmation fees. The fee detail was somewhat murky as to the total amount of fees incurred. At most, the fees and expenses listed in the detail add up to $21,357.94. Of course a reasonable fee can never be greater than the amount of services performed, so the fees are by definition capped at $21,357.94. The Liquidation Trustee shall make distributions accordingly to pay whatever amounts of the $21,357.94 remain outstanding.[8]

The Trustee also owed Gerloff $1,547.26 prior to closing. Prior to closing the sale, this was the amount due Gerloff, secured by its statutory mechanic's lien. Gerloff released this lien against the property at closing with the understanding its lien would attach to the proceeds in the hands of

---

[7] The Liquidation Trustee and counsel for the first lien holder both represented to the court that all but $7,522.21 of the first lien holder's attorneys' fees have been paid.

[8] During the hearing, Harmon also made some reference to the unpaid fees of its predecessor counsel. However, because those fees are not part of its request for attorneys' fees, the Liquidation Trustee shall not make distributions from the sale proceeds on account of those fees.

the trustee, pending final orders of this court. No party is contesting the Trustee's proposed distribution to Gerloff. Therefore, the court will authorize and approve that distribution.

Both the Inter National Bank claim and the Gerloff claim are secured claims with priority over the claim of the Comptroller. The trustee is authorized and directed to make distribution first to these two claims. The balance must be paid to the Comptroller, the remaining secured creditor.

## Conclusion

For the foregoing reasons, the court ORDERS the Liquidation Trustee to make distributions from the proceeds of the sale of the Hailey property as follows:

First, to first lien holder for reasonable attorneys' fees in the amount of $21,357.94;[9]

Second, to Gerloff for the balance of $1,547.26 owed for the repair work it performed; and

To the Texas Comptroller in partial satisfaction of its tax lien, to the extent of the balance of the proceeds in the possession of the trustee.

# # #

---

[9] The court leaves it to the Liquidation Trustee's own calculations to determine which part of this fee remains unpaid.